```
UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND
- - - - - - - - - - - - - - - - - -x

In re:                              :

ALBERTO G. SOSA                     :   BK No. 10-11702
          Debtor                            Chapter 7

- - - - - - - - - - - - - - - - - -x
```

### DECISION AND ORDER OVERRULING
### CREDITOR'S OBJECTION TO LOSS MITIGATION

APPEARANCES:

    Michael W. Favicchio, Esq.
    Attorney for the Debtor
    117 Metro Center Boulevard, #2001
    Warwick, Rhode Island 02886

    Lynn Bouvier Kapiskas, Esq.
    Attorney for Creditor, PHH Mortgage Corporation d/b/a
      PHH Mortgage Service Center
    Law Offices of Mark L. Smith
    176 Eddie Dowling Highway
    North Smithfield, Rhode Island 02896

    Susan W. Cody, Esq.
    John McNicholas, Esq.
    Attorneys for Creditor, PHH Mortgage Corporation d/b/a
      PHH Mortgage Service Center
    Korde & Associates, P.C.
    321 Billerica Road, Suite 210
    Chelmsford, Massachusetts 02184

    John Rao, Esq.
    Amicus Counsel
    National Consumer Law Center, Inc.
    7 Winthrop Square, 4th Floor
    Boston, Massachusetts 02110

**BEFORE ARTHUR N. VOTOLATO, United States Bankruptcy Judge**

BK No. 10-11702

Heard on November 18, 2010, on the Objection of PHH Mortgage Corporation d/b/a PHH Mortgage Service Center ("PHH"), a secured creditor, to the Debtor's Request for Loss Mitigation.[1] PHH objects on several grounds, which, when reduced to the basics, challenges the Bankruptcy Court's authority to require home mortgage lenders to participate in the Court's loss mitigation program. Because this dispute involves issues of first impression, an explanation of the Rhode Island *Loss Mitigation Program and Procedures* ("*LMP*" or "Program") should be helpful to readers generally, as well as in assisting the Court to address the parties' arguments in an orderly way.

### INTRODUCTION

The Rhode Island *LMP* became effective on November 1, 2009, pursuant to R.I. Bankr. Gen. Ord. 09-003, issued October 22, 2009. Thereafter, in response to growing pains associated with the implementation of the relatively new program, it was amended several times and is now operating under the *Third Amended Loss Mitigation Program*, effective August 23, 2010. R.I. Bankr. Gen. Ord. 10-003, issued August 17, 2010. The amendments have been

---

[1] This objection was heard along with the objection in another case, *In re Lawton*, BK No. 10-11302, which raised similar issues. The only difference in the two cases is that in *Lawton* a Motion for Relief From Stay was already pending when the debtors filed their request for loss mitigation. The Court notes that in considering and ruling upon this dispute, I have weighed the arguments presented by the parties in *Lawton*, as well.

1

BK No. 10-11702

aimed, essentially, at increasing the efficiency and user friendliness of the Program, and to simplify the use of recommended forms. As the Debtor's request for loss mitigation was filed on April 27, 2010, this proceeding is governed by the terms of the *Second Amended LMP*. The substantive provisions, however, are similar and applicable to all versions of the Program.

Since late 2007, bankruptcy case filings in this District have nearly doubled, reflecting the economic downturn experienced nationwide since that time, and which continues as of the writing of this decision. The *LMP* was implemented in response to the home mortgage and foreclosure crisis generally, and also to address an associated issue that at about the same time was being raised with increasing regularity in this Court. Specifically, at hearings on motions for relief from stay, debtors were routinely advising the Court that they had been seeking out of court loan modifications, forbearance agreements, or similar relief regarding their home mortgages, but that lenders' responses were virtually impossible to come by, despite multiple requests made to the mortgage holder or servicer. The stories were familiar and nearly identical. Creditors' counsel regularly stated that they were either unaware of such requests, or had no information to share – not even the name of a contact person. With communication between parties and a consensual resolution as the objectives, but too often without

BK No. 10-11702

enough information to assess the likelihood of an agreement, the Court repeatedly had to postpone hearings, order the parties to confer, and report their progress at yet another hearing. These multiple postponements were the result of the Court's inability to fix what had become a very disruptive information exchange deficit.[2]  That, in turn, resulted in calendars crowded with unresolved litigation.  Other courts were experiencing similar problems.

> At each weekly calender of relief from stay motions, debtors plead with the court for assistance in obtaining loan modification.  Sometimes they have been unable to penetrate the lenders' impenetrable phone tree to talk to a live person; or having reached someone at the other end of the line, they are unable to obtain answers to their inquiries after weeks or months of trying; or having submitted paperwork to the lender, only to be told more papers are required, or that the papers they've already submitted have been lost.

*Clawson v. Indymac Bank (In re Clawson)*, 414 B.R. 655, 661 (Bankr. N.D. Ca. 2009), *rev'd on other grounds*, 434 B.R 556 (N.D. Ca. 2010)(bankruptcy court order enforcing settlement agreement reversed and remanded).  This practice of parties repeatedly seeking more time simply because they had not yet connected was

---

[2] These are this Court's general observations, not specific to any case, but which were part of a clearly consistent pattern, i.e., that repeatedly coming back to court empty handed carried no consequences.  Having to listen to the Court express its frustration with the results of unsupervised mediation was obviously not a sufficient incentive to communicate, because nothing was getting done.

3

BK No. 10-11702

counter productive, it was a huge waste of time for the parties and the Court, and was forcing needless litigation, with costs and fees being wasted on useless services.

To address that condition, and with no end to it in sight, we decided to break the log jam by introducing a process "for debtors and lenders to [mediate and to] reach consensual resolution when a debtor's residential property is at risk of foreclosure" by "opening communications between debtors' and [the] lenders' decision-makers."[3] *LMP §I Purpose, 1.*

In order to address certain anticipated issues, this Court crafted, as carefully as it could, a process intended to ease some of the concerns of the residential lending community. Following are several examples of provisions intended to maintain the rights of the parties: (1) either the debtor or a creditor can initiate the process, *Second LMP, §V(A) & (B)*, 3-4; (2) if objections are filed, loss mitigation may not begin unless and until such

---

[3] The idea of court supervised loss mitigation did not originate in Rhode Island. The Bankruptcy Court for the Southern District of New York was the first to initiate such a program, and several bankruptcy judges in the Eastern District of New York have since adopted a similar program. The Bankruptcy Court for the Northern District of California has also established guidelines for addressing loan modifications in relief from stay litigation in chapter 11 and 13 cases. In addition, legislation in Connecticut, Indiana, Maine, New York and Vermont now requires local courts to implement their own mediation programs. Closer to home, Providence and Cranston, Rhode Island, have initiated similar local programs.

opposition is resolved, *Second LMP §V(D)*,5; (3) after entry of a Loss Mitigation Order, a "Party ... may request that the loss mitigation period be terminated for cause." *Second LMP §IX.C.(1)*, 10; (4) if cause for early termination is shown, the loss mitigation process is ended. *In re Cayard*, BK No. 09-12378, 2010 WL 1137931 (Bankr. D.R.I. March 17, 2010). The foregoing list is illustrative, and *not* all inclusive.

## **DISCUSSION**

The Debtor filed this Chapter 7 case on April 20, 2010, and requested loss mitigation on April 27, 2010. On May 11, 2010, Creditor PHH filed its objection to the Debtor's request, and on June 2, 2010, an initial hearing was held before Bankruptcy Judge Henry Boroff. On July 12, 2010, this Court appointed John Rao, Esq., of the National Consumer Law Center as *pro bono* amicus counsel. Thereafter, the parties filed briefs and arguments were heard on November 18, 2010. Relief from stay had not been requested as of the date of the loss mitigation request, nor has a motion since been filed by PHH or any other creditor in the seven months since the initial request was filed. Other than a general objection to having to participate in the program, PHH has not offered any "specific reasons why loss mitigation [concerning Mr. Sosa] would not be successful." *Second LMP §V(D),* 5. In fourteen months since the start of the Program, this Court has consistently

5

BK No. 10-11702

overruled objections to loss mitigation if the only reason alleged was "[m]y client does not wish to participate." *In re Simarra*, BK No. 09-14245, 2010 WL 2144150 (Bankr. D.R.I. April 14, 2010)("objection lacks any substantive merit" when it fails to "address the only relevant issue, i.e., 'specific reasons why loss mitigation would not be successful'").

In its oral and written arguments, PHH points out that the *LMP* refers only to 11 U.S.C. § 105(a) as authority to enforce the Program. PHH Memorandum of Law, at 2. From that, PHH argues that the LMP: (i) has enlarged the substantive rights of debtors by creating or granting a previously unauthorized *retention option* under 11 U.S.C. § 521(a)(2)(A); (ii) violated the relief from stay time constraints of 11 U.S.C. § 362(d); (iii) exceeds what Bankruptcy Courts are authorized to do under § 105; PHH Memorandum, at 3-5; and (iv) that "the Procedures are outside of the scope of the Court's Section 105(a) powers." Id. at 5.

The Debtor and *Amicus,* National Consumer Law Center, Inc. (NCLC) contend that even without a formal loss mitigation program in place, there is ample authority and precedent for the Court to regulate the administration of cases pending before it. Such authority is in the Bankruptcy Code, the Bankruptcy Rules, and in particular Fed. R. Bankr. P. 7016, which incorporates Fed. R. Civ. P. 16, and 9014. 11 U.S.C. § 105(d) provides that a "court on its

BK No. 10-11702

own motion ... (1) *shall* hold such status conferences as are necessary to further the expeditious and economical resolution of the case." Rule 7016 incorporates Fed. R. Civ. P. 16, which provides "[i]n any action, the court may order the ... [parties] ... to appear for one or more pretrial conferences for such purposes as ... (5) facilitating settlement." (Emphasis added). While Rule 7016 is not, per se, applicable to contested matters, Rule 9014(c) authorizes "the court ... at any stage in a particular matter [to] direct that one or more of the other rules in Part VII shall apply." Rule 7016 is one "of the other rules in Part VII."

The Court's interest in loss mitigation is twofold: (1) to encourage and facilitate home mortgage modifications, and thereby reduce foreclosures; and (2) to alleviate Court congestion and delay. While PHH emphasizes that *R.I. Bankr. Gen. Ord. 09-003* issued October 22, 2009, references only § 105(a), the *Second Amended LMP* requires a *status conference* to be held if loss mitigation is requested *after* the creditor has sought relief from stay. *Second Amended LMP §V.A(3),* 3. The current *LMP* clearly implicates Rules 9014 and 7016, which assist courts in determining early on: (1) whether a loan modification is likely; or (2) if the mediation has little or no chance of success, to terminate the loss mitigation and schedule a prompt hearing on relief from stay. In addition, requests for early termination are granted upon request

7

BK No. 10-11702

where it is shown that a loan modification is not feasible, and that further discussions would be futile. *In re Cayard, supra*.

That the Court has not compiled an all encompassing list of every relevant Code and Rule provision, does not indicate that the *LMP* is a stand-alone artifice which purports to give debtors new rights, or interferes with the existing rights of creditors. To the contrary, the *LMP* is but one of the Court's many case management tools available to manage its caseload. If the mediation process is successful, the parties go forward in their new relationship, and the resolved matter is removed from the Court's calendar. If mediation fails, the issues are adjudicated in accordance with applicable law.

The First Circuit Court of Appeals has held that "[e]ven apart from positive law, district courts have substantial inherent power to manage and control their calendars," *In re Atlantic Pipe*, 304 F.3d 135,143 (1st Cir. 2002), and that "it is within a district court's inherent powers to order [*even*] non-consensual mediation in those cases in which the step seems reasonably likely to serve the interests of justice." *Id*. at 145. (Emphasis added.) The source of federal courts' "'inherent power'... to manage their own affairs" is included within their power "to achieve the orderly and expeditious disposition of cases." *Link v. Wabash Railroad Co.*, 370 U.S. 626, 630-31, 82 S.Ct. 1386, 8 L. Ed. 2d 734 (1962). The Rhode Island *LMP*, which is far less sweeping or invasive than the

8

BK No. 10-11702

mediation order discussed in *Atlantic Pipe*, sets specific time frames and guidelines within which parties may negotiate mortgage modification(s) or any other agreement they deem to be mutually beneficial. The Rhode Island *LMP*, as designed and intended, does not permit the mediation process to just drift, without direction.

In addition to its point that the bankruptcy court lacks authority to enforce this *LMP*, PHH argues that the Program conflicts with § 521(a)(2)(A) by "allowing the debtor to elect a retention option not available under the Code." PHH Memorandum, at 3. Reading its memoranda literally, PHH also argues, incorrectly, that during loss mitigation, debtors may keep things in the status quo, without the consent of the secured creditor, thereby circumventing §§ 521(a)(2)(A), and (B). This argument is plainly incorrect and misleading. Section 521(a)(2)(B) provides that "within 30 days after the first date set for the meeting of creditors under section 341(a), *or within such additional time as the court, for cause, within such 30-day time fixes*, the debtor shall perform his intention with respect to such property...." (Emphasis added). Thus, the Code clearly envisions instances, such as those involving the renegotiation of a secured debt, where additional time will be required for the parties to perform their stated intentions regarding such property. Additionally, unlike § 521(a)(6) which provides for the automatic termination of the stay for failure to timely perform an intention with respect to personal

9

                     Document      Page 11 of 16

BK No. 10-11702

property, Congress specifically excluded real property from this new remedy. The *LMP* requires parties to *negotiate* within specific deadlines, gives secured creditors the right to speedy hearings, and termination for cause if it is shown that further negotiations would be futile. *See In re Cayard, supra*. Thus, to enable the parties to engage in meaningful, good faith negotiations, the court will presumably, after notice and hearing, exercise reasonable judgment in whether to extend the time to perform a stated intention with respect to real property used as a principal residence. To this Court's knowledge, except for the reasons specified in § 521(a)(2)(A), the only way debtors can retain secured property is via agreement with their secured creditors. If agreement is reached, no interest of the secured creditor has been affected. If mediation fails, the secured creditor still has its § 362(d) rights.

NCLC points out that the addition of § 524(j) to the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), renders PHH's allegation of conflict (regarding § 521(a)(2)) problematic, at best. Section 524(j) specifically exempts secured creditors from being in violation of the discharge injunction if they seek or obtain "periodic payments associated with a valid security interest ... [in the real property that is the debtor's principal residence]...." NCLC contends that this insertion was intended to codify the so-called "ride through" option for

10

BK No. 10-11702

distressed debtors who, *with creditor assent*, continue, post discharge, to pay their mortgages. PHH reads it differently, saying that the *only* purpose of § 524(j) was to allow creditors to inform homeowners of the status of their accounts by allowing them to send "payment coupons" to debtors. The legislative history does not support this narrow interpretation, and we summarily reject PHH's fragile proffer of what Section 524(j) means. *See* House Report 109-031, Part I, Sec. 202.[4] Also regarding the "ride through" issue, several courts have held that the BAPCPA amendments to § 524(j) and § 521(a)(6), with additional changes to § 362(h), show Congress's intent to eliminate the ride through option *only* as to personal property, and to permit debtors to "take advantage of the ride through option with respect to relevant real property" without reaffirming the underlying debt. *In re Carabello*, 386 B.R. 398, 402 (Bankr. D. Conn. 2008). *See also, In re Waller*, 394 B.R. 111 (Bankr. D.S.C. 2008); *In re Wilson*, 372 B.R. 816 (Bankr. D.S.C. 2007); *In re Bennet*, 2006 WL 1540842 (Bankr. M.D. N.C. May 26, 2006). *Contra, In re Linderman*, 435 B.R. 715,718 (Bankr. M.D. Fla.

---

[4] "Second, section 202 amends section 524 of the Bankruptcy Code to provide that the discharge injunction does not apply to a creditor having a claim secured by an interest in real property that is the debtor's principal residence if the creditor communicates with the debtor in the ordinary course of business between the creditor and the debtor *and such communication is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of an* [sic] *in rem relief to enforce the lien.*" House Report 109-031, Part I, Title II - Enhanced Consumer Protection, Sec. 202. (Emphasis added.)

11

BK No. 10-11702

2009)(*pre*-BAPCPA, the "Eleventh Circuit clearly has stated that a Chapter 7 debtor must either redeem or reaffirm a debt if the debtor wants to keep the collateral ... [and that decision] ... is still applicable and controlling"). In this Circuit, we are governed by *In re Burr*, 160 F.3d 843 (1st Cir. 1998), which holds that the ride through option is not available with respect to personal property. We note that *Burr,* like the *In re Harris* case, 421 B.R. 597 (Bankr. S.D. Ga. 2010), interpreted language in § 521(a)(2) that was unchanged by BAPCPA. *Id*. at 847-8. However, it is not necessary, and I do not address here, the larger post-BAPCPA question – whether debtors can force a permanent ride through on their homes without reaffirming the underlying debt. The loss mitigation process under scrutiny here in no way authorizes debtors to retain such property without the creditor's consent. Rather, it merely permits the Court to extend the time necessary to perform the stated intention until the parties know whether: (1) a new mortgage contract is being entered into (loan modification), or (2) the mortgage is to be reaffirmed, or (3) the property is being surrendered. Under Rhode Island's *LMP*, no new substantive rights are created, nor are any existing Code provisions infringed upon.

PHH also argues that the *LMP* conflicts with the relief from stay provisions of § 362. In its facial attack on the program, PHH raises several very unlikely scenarios where the *loss mitigation* process could alter certain of the secured creditors' rights under

12

§ 362. Even giving hypothetical deference to the creditor's argument, the Court disagrees that § 362 is so constraining that such a conflict should result in the nullification of the entire Program. Section 362(e) authorizes the court to extend the automatic stay for a specific time in "compelling circumstances." In light of the adoption of federal housing programs designed to assist distressed borrowers and their lenders, compelling circumstances clearly exist to extend the stay for the 60 to 90 days required by the negotiating parties to complete the loss mitigation process. If the debtor fails to cooperate in the process, the creditor may move to terminate the loss mitigation order, and if granted, an expedited hearing on any pending relief from stay motion will be scheduled. However, in the matter(s) before us, the conditional restriction on the filing of a relief from stay motion after loss mitigation has been initiated is not an issue that requires a decision on the present facts.[5] Nevertheless, and mindful that the Program is still relatively new, this Court will continue to examine, refine, and amend the LMP as necessary to maintain its utility, integrity, and operation as long

---

[5] In the instant case, PHH has not moved for relief from stay despite the fact that no order for loss mitigation has entered. In *Lawton*, a motion for relief was filed prior to the loss mitigation request but the parties consented to [Docket No. 18] the continuation of that motion until the resolution of the creditor's objection to loss mitigation. At hearing, creditor's counsel also raised a burden of proof issue concerning § 362(g). However, since no motion for relief from stay has been filed in the *Sosa* case, the burden of proof issue is not before us.

13

BK No. 10-11702

as necessary. For example, the Court finds relevant the following concession proposed by NCLC during oral argument. PHH concentrates on §VI.B.(1),6, of the Loss Mitigation Order which prohibits creditors from filing "Lift Stay Motions during the loss mitigation period." *Second LMP §VI.B.(1),6.* While this provision already contains adequate safeguards, by expressly permitting creditors to move for relief from stay where necessary to "prevent irreparable injury," the inclusion of this language is not necessary to support the goals of the process. Therefore, to keep the program as neutral and user friendly as possible, upon the filing of this Decision, §VI.B.1 of the *LMP* will be amended, prospectively, to allow motions for relief from stay to be filed during the loss mitigation period. However, if it appears that such motions are being filed prematurely, and/or primarily to drive up costs to debtors, particularly when a consensual loan modification is in progress, the Court will consider, on a case by case basis, whether such fees and costs are appropriate. Since the inception of the *LMP,* creditors have had the right to object and be heard on loss mitigation requests under *§V.D* of the Program, before a loss mitigation order may enter. The existing part of that section requiring the objector to allege "specific reasons why loss mitigation would not be successful," will still apply.

14

BK No. 10-11702

## CONCLUSION

The Rhode Island Loss Mitigation Program was conceived as a case management tool designed to encourage the resolution of differences between residential mortgage lenders and their borrowers, and to provide a way for them to access the various federal housing programs available outside of bankruptcy, such as the Home Affordable Modification Program (HAMP). The Loss Mitigation Program is intended to start a dialogue, giving the parties nothing more than the opportunity to discuss their respective positions. The alleged dire consequences of the implementation of such a Program, as predicted by PHH have not materialized, and if any do emerge, they will be judicially addressed forthwith.

For the reasons discussed above, and based on the arguments of the NCLC and by the Debtors, here and in *Lawton*, which are adopted and incorporated herein by reference, PHH's Objection to participating in this Court's loss mitigation program is **OVERRULED**.

Dated at Providence, Rhode Island, this 28th day of January, 2011.

                                                        Arthur N. Votolato
                                                       U.S. Bankruptcy Court

Entered on docket: 1/28/11